T. F. FOLKS and STATE v. COUNTY OF MARION.

163 So. 298.

En Banc.

Opinion Filed Sepember 26, 1935.

18

*A. P. Buie,* for Appellant;

*Norris F. Baskin,* for Intervenor;

*Wallace E. Sturgis,* for Appellee.

BROWN, J.—This is an appeal from a decree of the Circuit Court for Marion County rendered on March 25, 1935, validating an issue of county refunding bonds.

The question involved on this appeal, stated in general terms, is whether or not homesteads, as defined by Article X, Section 7, of the Constitution, being the constitutional amendment adopted on November 6, 1934, are subject to taxation for the payment of county refunding bonds authorized and issued after the adoption of said homestead exemption amendment, such refunding bonds being in renewal or extension of the obligation evidenced by county bonds issued prior to the adoption of said amendment, at a time when homesteads, as so defined, were subject to taxation for the payment of such original obligation.

The petition for validation shows that on February 19, 1935, the Board of County Commissioners of Marion County adopted a resolution authorizing the issuance of $110,000.00 of Refunding Road Bonds, Series B, to be dated July 1, 1935, bearing interest at 5 per cent. per annum, to refund fifty per cent. of $220,000.00 of road bonds issued in July, 1920, and falling due July 1, 1935. The resolution states that the county will not have on hand when the original bonds mature sufficient funds to pay more than one-half the

amount then falling due; hence the necessity for issuing the refunding bonds, under authority of Chapter 15772, Laws of 1931, to take care of the other half.

The form of ·the refunding bonds', as provided in the resolution, reads in part as follows:

"The County of Marion, in the State of Florida, is justly indebted and for value received hereby promises to pay to the bearer, or, if this bond be registered, to the registered owner hereof, on the first day of July, 1935, the principal sum of FIVE HUNDRED DOLLARS, together with interest thereon at the rate of five per cent. per annum, payable semiannually on the first days of January and July of each year upon the presentation and surrender of the annexed interest coupons as they severally become due. Both principal and interest of this bond are payable in lawful money of the United States at the Central Hanover Bank & Trust Company in the City of New York. For the prompt payment hereof and the interest hereon as the same shall fall due, the full faith, credit and taxing power of said county of Marion are hereby irrevocably pledged to the same extent and with like force and effect as the same were pledged for the payment of the indebtedness refunded hereby.

· "This bond is issued by said county under the authority of and in full compliance with the General Refunding Act of 1931, being Chapter 15772, General Laws of Florida, 1931, and pursuant to a resolution duly adopted by the Board of ·County Commissioners' of said county, and is issued for the purpose of refunding a like face amount of· valid subsisting bonded indebtedness of said county, outstanding at the date of the passage of said Act and consisting of fifty per cent of the indebtedness evidenced by a $1,000 5% Road Bond of said County, dated July 1, 1920, and maturing July 1, 1935."

· · There is a provision in the bonds giving the county the option to redeem on any interest date upon notice given. Then follows a paragraph which contains this clause:

"That provision has been made for the levy and collection of a direct annual tax upon all property within said county, except only such property as would be exempt from taxation under the provisions of the laws and Constitution of Florida which were in force and effect at the time of the creation of the indebtedness refunded hereby, sufficient to pay the principal and interest of this bond as the same shall fall due."

The resolution provides for a sinking fund to pay the bonds at maturity, requiring prescribed payments into such fund annually commencing in 1945. Paragraph 7 reads as follows:

"Section 7. In each year while any of said refunding bonds shall be outstanding, there shall be levied upon all property within the County of Marion, except only such property as would be exempt from taxation under the provisions of the laws and Constitution of Florida which were in force and effect at the time of the creation of the indebtedness refunded, a tax sufficient to pay the interest upon such bonds as the same shall fall due and to make the sinking fund payments required by this resolution; provided, however, that when there shall be in the funds provided for said interest and sinking funds amounts exceeding the amounts at that time required for such funds, the tax required by this section for the then current fiscal year may be reduced by the amount of such excess."

· Section 10 of the resolution reads as follows:

"Section 10. Said Refunding Road Bonds, Series B, shall be issued to refund a like amount of bonded indebtedness of said county, consisting of fifty per centum (50%) of the

indebtedness evidenced by the Road Bonds described in Section 1 of this resolution which mature on July 1, 1935. And upon the due execution of said Refunding Road Bonds, Series B, they shall be deposited by the Clerk of the Board of County Commissioners, at one time or from time to time, together with a sum equal to the face amount of the bonds so deposited, with a bank or trust company chosen by said Clerk, with instructions to said bank or trust company that upon the surrender of each $1,000 maturing bond to be refunded there be paid thereon to the holder thereof the sum of $500 and that there be delivered to such holder one $500 Refunding Road Bond, Series B, and that the maturing bonds so surrendered be cancelled by perforation and forwarded to the Clerk of the Board of County Commissioners; *provided, however, that nothing herein contained shall be deemed to prevent the Board of County Commissioners from hereafer ordering the sale of any bonds herein authorized in the manner provided by said General Refunding Act of 1931."* (Italics supplied.)

Section 15 reads thus:

"Section 15. For the prompt payment of the principal and interest of the Refunding Road Bonds, Series B, as the same shall fall due, issued pursuant to this resolution, the full faith, credit and taxing power of said County of Marion are hereby irrevocably pledged to the same extent and with like force and effect as the same here pledged for the payment of the indebtedness refunded by said bonds."

It will be noticed that the italicized portion of Section 10 would permit the Board of County Commissioners to order the sale of any of said bonds "in the manner provided by said General Refunding Act of 1931," which is said Chapter 15772.

The Refunding Act of 1931, referred to, is quite broad

and comprehensive in its terms, and in Section 8 thereof provides that the refunding bonds issued thereunder *"may be exchanged* for not less than an equal principal amount and/or accrued interest of indebtedness to be retired thereby, including indebtedness not yet due, if the same be then redeemable, or if the holders thereof be willing to surrender the same for retirement, *but otherwise shall be sold and the proceeds thereof shall be applied to the payment of such indebtedness* and/or accrued interest due or redeemable which may be so surrendered." (Italics supplied.) We will discuss the effect of this section later on.

Section 22 of said Act provides that: *"In each year while any of the bonds shall be outstanding there shall be levied* by or under authority of the governing board *upon all taxable property in the unit an ad valorem tax* sufficient to pay the interest and principal of such refunding bonds," etc. (Italics supplied.) Does this language limit the levying "in each year" of a tax to pay the refunding bonds to a tax on all property which is taxable under the laws existing at the time the levy is made, or may the words "all taxable property" be reasonably construed to mean all property which is lawfully and properly taxable for the payment of the refunding bonds, including, if it may be done, all property which was taxable for the payment of the original bonds thus refunded? The answer to this question evidently turns upon the answer to the main question in this case, which concern what property is "taxable property" for the payment of refunding bonds, of the kind authorized by the Act and provided for by the resolution adopted by the county commissioners in this instance.

The language used in Section 23 of said Refunding Act is somewhat different from that used in Section 22, but as that section is limited to bonds issued by municipalities,

it does not affect the provisions of Section 22 above pointed out.

The petition for validation was resisted in the court below, both by the State through its State Attorney, A. P. Buie, and by T. F. Folks, a citizen, taxpayer and homestead-owner of Marion County. Each denied that Chapter 15772 authorized the issuance of the refunding bonds in the manner proposed, and alleged that the resolution, and the issuance of the bonds thereunder, would violate the homestead exemption amendment of November 6, 1934, which amendment exempts "from all taxation, other than special assessments for benefits" the homestead as defined in Article X of the Constitution up to the valuation of $5,000.00, in that said resolution attempts to pledge the taxing power of the county to the same extent and with like force and effect as the same was pledged for the payment of the indebtedness sought to be refunded, which would, if carried out, result in the taxation of homesteads as well as other property, and that such refunding bonds should not be validated until after the authorizing resolution has been so amended as to conform to said homestead exemption amendment.

The decree of validation was rendered on March 25, 1935, by an able and justly venerated Circuit Judge who, after thirty-four years of distinguished service on the Circuit Court bench has since departed this life. In his decree, Judge Bullock found the material allegations of the petition to be true. He also found that "homesteads within the meaning of added Section 7 of Article X of the Constitution, adopted at the general election held November 6, 1934, constitute a large percentage of the property values in the County." And as conclusions of law from the facts reviewed, the learned Circuit Judge found as follows:

"1. That the General Refunding Act of 1931, being

Chapter 15772, General Laws of Florida, 1931, and Section 6 of Article IX of the Constitution, as amended in 1930, fully authorize the issuance of said Refunding Road Bonds, Series B, and their issuance has been duly provided for by a resolution properly adopted by the Board of County Commissioners of said county.

"2. That said Refunding Road Bonds, Series B, will merely evidence an extension or renewal, in a new form, of the original existing indebtedness, which original indebtedness is not extinguished by, but is merged into, the refunding bonds with like force and effect as to obligation as if the original indebtedness had remained unrefunded by the issuance of such refunding bonds."

"3. That the refunding bonds will constitute a valid continuation and extension of the obligation of the bonded indebtedness refunded, and the only property in the County which will not be subject to the levy of taxes to pay the obligations evidenced by the refunding bonds, is such property as would be exempt from taxation under the provisions of the laws and Constitution which were in force and effect at the time of the issuance of the original bonds."

"4. The question whether homesteads can be taxed for the payment of the proposed refunding bonds is properly before the Court for adjudication in this proceeding and it is the judgment of the Court that homesteads will be subject to taxation for the payment of the refunding bonds."

The principles of law regarding the nature of refunding bonds, and their effect as regards the taxation of homesteads, as stated in Judge Bullock's opinion, are practically the same as those set forth in the very able opinion of Mr. Chief Justice Davis in the case of Boatright v. City of Jacksonville, 117 Fla. 477, 158 So. 42, decided in December, 1934, and concurred in by Justices Whitfield and Terrell.

The other three members of the court were of the opinion that the general question here sought to be presented was not properly presented for decision by the record in the Boatright case. As the writer views it, the question is squarely presented for decision on this appeal. It was presented to the Circuit Court by the pleadings in this case, and it was within the jurisdiction of that court to adjudicate the question, subject of course to appellate review. See State v. Citrus County, 116 Fla. 676, 157 So. 4, and cases cited.

In order to determine the extent of the taxing power which may be exerted in order to provide for the payment of the proposed refunding bonds, it is necessary to determine what taxing power existed at the time the refunding resolution was adopted on Feb. 19, 1935, and still exists, as security for the payment of the original bonds which were issued some fourteen years before the homestead exemption amendment of November 6, 1934, was adopted. In other words, did said constitutional amendment withdraw the power to levy taxes on homestead property if necessary to provide for the payment of the bonds which had been issued prior to the adoption of said amendment?

This question must be answered in the negative. Section 10 of Article I of the Constitution of the United States provides that, "No State shall * * * pass any * * * law impairing the obligation of contracts." The construction and application of this section of the national Constitution is primarily a federal question, upon which the decisions of the Supreme Court of the United States are controlling. That court has held that a State constitutional provision is a law within the meaning of this inhibitory clause of the federal Constitution, and that "a State can no more impair the obligation of a contract by her organic laws than by legislative enactment." See New Orleans Gas Light Co. v. Louisiana

Light, etc., Co., 115 U. S. 650, 6 S. C. 252, 29 L. Ed. 516; Edwards v. Kearzey, 96 U. S. 595, 24 L. Ed. 793; Gunn v. Barry, 15 Wall, 616, 21 L. Ed. 212.

This was pointed out in the opinions of Mr. Justice WHITFIELD in the cases of Gray v. Moss, 115 Fla. 701, 156 So. 262, and Gray v. Winthrop, 115 Fla., 721, 156 So. 270, both of which cases were decided by this court on July 7, 1934, several months before the homestead exemption amendment was adopted. These cases grew out of an effort to enjoin the Secretary of State from taking those steps which were legally necessary to submit said constitutional amendment to a vote of the people at the then approaching general election. The injunction was denied. The present Chief Justice WHITFIELD in his opinion in said case of Gray v. Moss, *supra*, said: "The words 'there shall be exempted from all taxation,' as used in the proposed amendment to the State Constitution, mean 'from all taxation' when not restrained by the paramount Federal Constitution to which the proposed amendment is and is intended to be subject, just as though the paramount law had been expressly made a part of the amendment. (Citing authorities.) The proposed amendment exempting homestead real estate from taxation, if adopted, *might* not be restrained by the superior federal law as to taxation for governmental operating expenses and as to future contract obligations, though it may be legally inoperative as to taxation for existing contract obligations."

In Gunn v. Barry, *supra*, a case decided by the Supreme Court of the United States in 1873, it was held that a constitutional provision and statute of the State of Georgia which increased the amount of property exempt from execution were, as to judgments recovered before their adoption, void. It was also held in that case that the legal

remedies for the enforcement of a contract which belong to it at the time and place where it is made, are a part of its obligation, and cannot, by State action, be thereafter substantially changed.

Other decisions of the federal Supreme Court bearing on this subject are well reviewed in the opinion of Mr. Chief Justice DAVIS in Boatright, v. City of Jacksonville, *supra*, among them being Hoffman v. City of Quincy, 71 U. S. (4 Wall.) 535, 554, 18 L. Ed. 403 and Edwards v. Kearzey, *supra*. There are some later decisions by the same eminent tribunal which reaffirm these principles. See W. B. Worthen Co. v. Thomas, 292 U. S. 426, 78 L. Ed. 1344, 54 S. Ct. 816, 93 A. L. R. 173, wherein it was held that a statute exempting all moneys paid on insurance policies from liability for the payment of debts, was, as applied to debts owing before the exemption was created, an unconstitutional impairment of contract obligations; and the case of W. B. Worthen Company, as Trustee, *ex rel.*, v. Kavanaugh, decided April 1, 1935, and not yet reported, wherein certain statutory changes made by the Legislature of Arkansas in 1933 pertaining to the remedy for the enforcement of the payment of assessments made by a Street Improvement District in 1930, upon the faith of which bonds had been issued, were held to constitute an unconstitutional impairment of the obligation of the bonds theretofore issued and sold. In the opinion of Mr. Justice CARDOZO in that case, it was said: "To know the obligation of a contract we look to the laws in force at its making." In Home Bldg. & Loan Association v. Blaisdell, 290 U. S. 398, 78 L. Ed. 413, the same Court speaking through Mr. Chief Justice HUGHES, quoting from the opinion in Hoffman v. City of Quincy, *supra*, said: "The laws which subsist at the time

and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms. This principle embraces alike those which affect its validity, construction, discharge and enforcement."

The conditions which lead the Court in the Blaisdell case to uphold the limited, temporary and conditional Minnesota Moratorium statute, designed to protect both debtor and creditor, do not apply here. We are not dealing with a statute of temporary operation adopted to meet a present pressing emergency, but with a constitutional amendment designed to put into effect a permanent State policy. We thoroughly agree that it is the duty of the courts to give full force and effect to the policy thus expressed by the people of this State in so far as it can be done without violating the Constitution of the United States, which, by its terms, is made the "Supreme Law of the Land." The State constitutional amendment we are here considering still has a broad field of operation, even though the contract clause of the federal Constitution be given full force and effect. As this clause applies only to State action, and does not affect the power of Congress, the recent "Gold Clause" decisions of the Federal Supreme Court, cited by appellants, are not in point here. The cases of Gilman v. City of Sheyboygan, 2 Black 510, 17 L. Ed. 305, and Arkansas So. Ry. Co. v. La. & Ark. Ry. Co., 218 U. S. 431, 31 S. Ct. 56, 54 L. Ed. 1097, are discussed in the opinion of Chief Justice Davis in the Boatright case, at pages 47-48 of 158 So., and we will add nothing further, except to observe that if any doubts were raised by some of the expressions used in the opinions in those cases, as to the position of the Federal Supreme Court on the question above discussed, such doubts have been entirely dispelled by the later decisions of that

Court hereinabove cited. Our own decisions, construing the contract clause of the Florida Constitution, are, and long have been, in harmony with those of the Federal Supreme Court. See Columbia County v. King, 13 Fla. 451, and the long line of cases following it. In Columbia County v. King, this Court held that, "When a county issues its bonds under a statute which provides the time and manner of discharging them, as by levying an annual tax, the Legislature cannot, by repealing the Act or changing it, limit the amount of taxes to be levied to a rate insufficient to raise the amount necessary to meet the obligation, unless other adequate means are provided. Such a law impairs the obligation of the contract." See also the opinion of Mr. Justice BUFORD in State, *ex rel.* Buckwalter v. City of Lakeland, 112 Fla. 200, 150 So. 508, wherein many of our own as well as the decisions of the Federal Courts are cited and quoted from.

It is not contended that any "other adequate means" has been provided to meet the obligation of the bonds here sought to be refunded. It necessarily follows that the obligation and taxing power attaching to said bonds remains the same as it was before the homestead exemption amendment of November 6, 1934, was adopted, and that homesteads as therein defined remain subject to taxation for the payment of said original bonds the same as they did when such bonds were issued and sold some fifteen years ago. This conclusion is inescapable, and is the inevitable result of the contract clause of the national Constitution as construed by the Supreme Court of the United States.

But will this same obligation and taxing power continue to exist in support of the refunding bonds proposed to be issued and sold under the authority of the resolution adopted by the county commissioners subsequent to the adoption of

the homestead exemption amendment? This is the contested question here.

The general refunding Act of 1931 gives broad and full authority for the issuance of refunding bonds and we have in several cases held that such refunding bonds can be issued and sold, under the terms of said Act, without submittng the matter to a vote of the people, by virtue of the Act itself and the concluding clause of Section 6 of Article IX of the Constitution, adopted in 1931, which reads: "but the provisions of this law shall not apply to the refunding of bonds issued exclusively for the purpose of refunding of the bonds or the interest thereon of such counties, districts or municipalities." The first clause of said amendment prohibits the issue of bonds unless the same "shall have been approved by a majority of the votes cast in an election in which a majority of the freeholders who are qualified electors residing in such counties, districts, or municipalities shall participate, to be held in the manner to be prescribed by law," then follows the provision as to refunding bonds above quoted. The purpose of this constitutional amendment was stated in the case of Sullivan v. City of Tampa, 101 Fla. 299, 134 So. 211, where this Court said:

"May it not be said that the intent of the people was to prevent further abuse of the power to issue new and additional obligations, while at the same time facilitating the refunding of existing obligations already outstanding? Such obligations were not to be repudiated; they had to be paid or refunded. While the main evil sought to be prevented or remedied by the amendment was the further increase of the bonded indebtedness of the several counties, municipalities and districts of the State except upon the authority of the people expressed in an election, it was also

necessary that provision be made for authorizing the refunding of existing obligations, and even 'the interest thereon.' There was certainly no intent that this power of refunding should be impaired or unduly burdened."

There is, however, nothing in the constitutional amendment of 1934 nor the refunding Act of 1931 which says that the same property which was taxable for the payment of the original bonds' shall remain taxable for the payment of refunding bonds. We have, in the earlier part of this opinion, commented on the provision of Section 22 of the Refunding Act to the effect that "in each year" there shall be levied "upon all taxable property in the unit" an ad valorem tax sufficient to pay the interest and principal of the refunding bonds, but, as already pointed out, that leaves the question as to just what property is "taxable" each year for the payment of refunding bonds of the kind under review. The United States Supreme Court has' not spoken on this subject. For an answer to this question we must look to the well settled general principles of law which are applicable.

Undoubtedly, the effect of the homestead exemption amendment of 1934 is to withdraw from all taxation (other than special assessments for benefits) homestead real estate as defined therein, except such as is pledged for the payment of contracts theretofore made, the obligation of which would be impaired by such withdrawal, and which obligations are saved from such impairment by the contract clause of the Federal Constitution. For, admittedly, under the very rule laid down by the Federal Supreme Court, that the obligation of a contract is' measured by the law existing when it is made, the homestead exemption amendment would be fully effective as against new contracts, evidencing new obligations, made and entered into after its adop-

tion. But are the refunding bonds here proposed new contracts evidencing a new obligation, or are they mere renewals and extensions of the original contracts evidencing the same, obligations, and entitled to the benefit of the same security, that is, the same taxing power, the pledge of which protected and formed a part of the obligation of the original bonds?

As to the refunding bonds which are to be used merely to replace a like amount of the balance due on each of the original bonds, and which are to be exchanged for a like amount of the old bonds, in the hands of their holders, as provided in Section 10 of the authorizing resolution, herein above quoted, the question above propounded should be answered in the affirmative, because the real effect is merely, by agreement between the parties, that is, between each of the holders of the original bonds and the county, to extend the time of payment of the obligation by substituting or exchanging a renewal bond for the old bond, with the express understanding that there shall be no change in the security, that is, the taxing power behind the old bond. But to have this effect, the italicized clause at the end of Section 10 of the resolution as hereinabove copied, giving the board of county commissioners the power to sell any of said refunding bonds, would have to be eliminated by amendment, for when refunding bonds are sold in the open market to new parties and the new money thus borrowed is used to pay off the present bondholders and discharge the old bonds, new parties are brought in and new money borrowed, and hence a new contract based on a new consideration and with different parties is made, which new contract could only lawfully pledge the taxing power existing under the Constitution and statutes in effect when the new contract is made; whereas the authorizing resolution and the

bonds now under review attempt to place behind all the refunding bonds, those sold as well as those exchanged, the taxing power which existed in 1920 when the original bonds were issued.

It is true that such sale of the refunding bonds and the use of the money thus borrowed to discharge a like amount of the old bonds may not increase the amount of the county's indebtedness, nor create any additional security other than that which was behind the original bonds, and hence no election may be necessary to authorize them, but when such bonds are sold in the market, each of them so sold amounts to a new contract for a present new consideration in money, and the use of such new money to pay off and discharge the original bonds *pro tanto* absolutely, extinguishes such original bonds, and the refunding bonds so sold stand on their bottom and constitute new contracts which have behind them only the taxing power which exists at the time of the transaction, and hence homesteads would, by virtue of the constitutional amendment of November 6, 1934, be exempt from taxation for their payment. This effect cannot be obviated by including in the authorizing resolution and in the refunding bonds an agreement or pledge that such bonds shall enjoy a taxing power which had been denied by a constitutional amendment adopted before such authorizing resolution was passed.

The effect of a sale of refunding bonds to new parties for the purpose of raising money to discharge the old bonds, and which is so used, is somewhat akin to a novation, which is defined in general terms in the American Law Institute's Restatement of the Law of Contracts, black letter text, Section 424, as "a contract that (a) discharges immediately a previous contractural duty or a duty to make compensation and (b) creates a new contractual duty, and (c) in-

cludes as a party one who neither owed the previous duty nor was entitled to its performance." See also Willison on Contracts, Section 1865, wherein it is said that: "A contract may be discharged by novation; that is, a substitution of a new contract for the old." And in the same paragraph it is said: "In a novation, the new contract of itself effects the discharge." So the analogy is not complete. When A borrows money from B, giving B his note, for the purpose of getting money to pay another note which A owes to C, but fails to make such payment to C, A's debt to B is not affected, and remains a binding contract. It is not B's fault that C was not paid. So both notes stand. But if A uses the money so borrowed, as he proposed to do, and pays the note held by C, that note is discharged by payment and not by merger or novation. The note given by A to B for the money borrowed, B not having been in any way obligated to pay the note which A had formerly executed to C, is a new and independent contract. And the result would not be different even though A had agreed to give B the same security which had been pledged to secure the old debt to C.

In such a case, there is no merger of the old obligation into the new. Merger of a previous contractual obligation into a new contract can only take place between parties to the old obligation. See Restatement of Law of Contracts, Section 443. In the comment on this section, it is said: "The discharge of a duty owed by A by the creation of a duty owed by B or the creation of a right in A in substitution for a right in B, is a novation, not a merger. To effect a merger the new obligation must be between those who were parties to the old obligation." And Section 446, the same chapter, dealing with merger by sealed instruments, reads: "A contractual duty or a duty to make compensation is merged in the duty created by the subsequent

formation of a sealed contract between the same parties providing for the same performance." And in Section 448, dealing with "Merger by negotiable instruments," the black-letter text is as follows: "A contractual duty based on an unsealed contract, or a duty to make compensation for breach of either a sealed or unsealed contract is discharged by a negotiable instrument made by the party subject to the duty and promising performance of it, if given as full satisfaction by him *and accepted as such by the party entitled to performance.*" (Italics ours.)

As was pointed out in the opinion of Mr. Justice STRUM in the case of Davis v. Dixon, 98 Fla. 87, 123 So. 536, the rule is almost universal that even where the state Constitution requires a vote of the electors to originally authorize the issuance of bonds, no such election is necessary to the issuance of refunding bonds purusant to statute for the purpose of discharging the outstanding original bonds, "so long as the refunding bonds create no additional or increased liability on the part of the obligor," unless the statute requires a resubmission to the electorate. "The theory of the cases so holding," said Justice STRUM, "is that since the bonds are not the debt itself, but the legal evidence of the existence of the debt, the issuance of refunding bonds for the purpose of discharging and existing legal indebtedness, originally incurred in accordance with the constitutional requirement, does not create a new debt or impose any new liability against the taxpayers or their property within the meaning of such constitutional provision, but merely renews and continues in a changed form the original existing indebtedness which was originally created in conformity with the Constitution, and that such constitutional provision therefore does not prohibit the renewal, without a vote, of

the previously existing valid debt, so long as no additional or increased liability is created."

But the question thus discussed in the case of Davis v. Dixon is not the exact question we are here confronted with. It is true that it was held in that case that an issue of refunding bonds of the kind referred to in the above quotation would not have to be authorized by a vote of the people, but it was not held that refunding bonds authorized to be issued and sold, as is this case, to persons other than the holders of the original bonds, for the purpose of raising the money to pay and discharge the old bonds, would, under the contract clause of the Constitution, enjoy the same taxing power that the old bonds had, in spite of a constitutional amendment exempting certain property from taxation adopted after the old bonds, but before the new bonds were issued.

The opinion and decision of this Court in the case of State, *ex rel.* Sherrill v. Milam, 113 Fla. 451, 153 So. 100, decided some two years ago, held that the refunding bonds involved in that case constituted a new obligation, and that the taxing power in support of them was determined by the law in effect when the refunding bonds were sold. In the prevailing opinion in that case, written for the Court by Judge A. G. Campbell, the following appears:

"We think that, while the issuance of the refunding bonds, authorized under Chapter 10027, *supra,* did not add to or increase the indebtedness of Everglades Drainage District, yet the issuance and sale of such bonds *did* create new and different contracts or obligations *evidencing* such indebtedness. Under the provisions of Chapter 10027, Laws of Florida, *supra,* authorizing the refunding of the indebtedness of the district, the board of commissioners' of Everglades Drainage district were authorized to '*borrow* money

and issue, in the corporate name of the said Board, *notes or negotiable coupon bonds'* of the district, to procure means to refund the original bonds sought to be retired.

"When money is borrowed there is necessarily a contract either express or implied to pay it back. Under the law authorizing the board of commissioners of Everglades drainage district to borrow money to refund the existing bonded indebtedness, they were directed to, and they did, according to the allegations of the alternative writ of mandamus as amended, enter into express contracts, viz., negotiable coupon bonds, evidencing the obligation of the district to pay back such *borrowed money. * * * * In the instant case the indebtedness evidenced by the bonds retired with the proceeds from the refunding bonds still exists In so far as the amount thereof, and the liability of the drainage district therefor, is concerned; *but* it is evidenced by a new or different obligation or contract, viz., negotiable coupon refunding bonds of the district, issued and sold under the authority of Chapter 10027, *supra,* to purchasers in the open market. If A, being indebted to B, in a certain sum, executed his promissory note payable to B for the amount, and for the purpose of retiring his note to B, A borrows a similar sum from C, executing his promissory note payable to C for the amount, and with this money retires his note to B, he does not in the transaction cancel or diminish his indebtedness or liability, he only secures a release from his obligation to B by making a new and different contract or obligation evidencing the indebtedness. C, from whom A procures the money to retire his obligation to B, is not concerned with the assets and the ability of A to pay at the time he executed his note to B, but he *is* concerned with and will satisfy himself as to the assets and ability of A, at the time he executed the note to C. The situation regarding the retire-

ment of original drainage district bonds with the proceeds of money borrowed on refunding bonds of the district as set forth in the alternative writ of mandamus amended, before us in this case, is analogous to that given in the foregoing illustration."

The decision of this Court in the above case just quoted from was, on the point mentioned, contrary to the decision rendered by a three-judge Federal Court a short time before, in the case of Rorick v. Board of Commissioners of Everglades Drainage District, 57 Fed. (2d) 1048. And Mr. Justice WHITFIELD and the writer dissented in the case of State, ex rel. Sherrill, v. Milam, but the majority opinion of Judge Campbell in that case was an able one and has never been overruled by this Court. It therefore stands as a precedent in this State. It is true, both the decision of this Court and that of the three-judge Federal Court dealt with the construction of a somewhat bewildering array of statutes, while here the question presented, is clear-cut, and deals, not with the effect on refunding bonds of a statute increasing their taxing power over that existing when the original bonds were issued but with the effect on refunding bonds, such as are attempted to be authorized in this instance, of a constitutional amendment, exempting homesteads from taxation, adopted before such refunding bonds were attempted to be authorized or issued. However, the reasoning which led to the conclusion adopted by this Court in State, ex rel. Sherrill, v. Milam is quite applicable here, and the decision of this Court in that case forms a strong precedent which would have to be overruled and set aside before we could reach a different conclusion in this case. Upon further consideration of the question in the light of general principles of law, the writer has reached the conclusion that the reasoning employed by Judge Campbell in

the case referred to, as applied to the situation herein presented, is sound, and that we would not be justified in overruling that case.

The only case closely in point, decided outside this state, which has been brought to our attention, and which is contrary to the views herein expressed, is the recent West Virginia case of Keeney v. Kanawha County Court, 175 S. E. 61, cited by Mr. Chief Justice DAVIS in the Boatright case, *supra*. There had been a tax limitation amendment adopted in that State before the road district refunding bonds there in question had been issued. It was held that the refunding bonds were issued in accordance with the refunding statute, which statute provided for the delivery for cancellation of a like amount of the old bonds which were to be refunded; that the issuance of the refunding bonds was not the creation of a new debt, but simply a change in the form of the old and in the evidence representing it, and that therefore the same debt service levies could be .made for their payment as could have been made for the payment of the pre-existing bonds. The question of the effect of selling the refunding bonds in the open market was not discussed.

As between Marion County and the holders of its bonds issued in 1920, an exchange of the refunding bonds for a like amount of the old bonds, delivered up for cancellation, with the agreement that the same security in the way of taxing power which was behind the old bonds shall continue as security for the payment of the new bonds, is valid and enforceable, notwithstanding the intervening homestead exemption amendment, under the principle laid down by this Court in the case of Drake Lumber Co. v. Semple, 100 Fla. 1757, 130 So. 577, 75 A. L. R. 687. It was held in that case that the taking up of a mortgage note and the substitution of another therefor is not a discharge

of the original debt between the original parties, and the mortgage would continue in effect as against a subsequent purchaser; that it was the debt, and not the mere evidence of it that was secured. This holding is in line with the decisions in other jurisdictions. See 41 C. J. 468. But a mortgage given to secure a particular debt cannot be enforced as security for another and different debt. 41 C. J. 466.

The writer is therefore of the opinion that the refunding resolution, in so far as it pertains to an exchange of the new bonds for a like amount of the old, and in so far as it agrees that as to the new bonds thus exchanged the same taxing power which protects the old bonds shall continue in full force and effect, is good notwithstanding the intervening constitutional amendment exempting homesteads from taxation; for refunding bonds of this character, and so used, fall clearly within the description of the nature and effect of refunding bonds as given by the learned chancellor in this case, and as given in Bay County v. State, 116 Fla. 656, 157 So. 1, and State. *ex rel.* Pinellas County, v. Sholtz, 155 Fla. 736, and in the opinion of Mr. Chief Justice Davis in the Boatright case, *supra,* to the effect that "Refunding bonds are not only obligations in themselves for what they purport to be on their face and under statutes pursuant to which they are issued, but are authorized extensions and continuations of the obligations represented by the bonds that are refunded."

I am therefore of the opinion that the decree below should be reversed and the cause remanded to the Circuit Court with directions to permit the filing, if desired, of an amended and supplemental petition on the part of Marion County, embodying any resolution that may be hereafter adopted by the board of county commissioners modifying the resolution set forth in this case by eliminating from the same such

portions thereof as are inconsistent with the principles here-inabove expressed, and upon the filing thereof to proceed with such validation proceeding to a decree in conformity with the views above expressed.

. The foregoing opinion, representing the views of the writer, is concurred in by Mr. Chief Justice WHITFIELD, Mr. Justice TERRELL and Mr. Justice DAVIS in so far as it holds that the Homestead Exemption Amendment of November 6, 1934, could not affect or impair the taxing power which had been pledged as security for the payment of the bonds already issued and outstanding at the time said amendment was adopted, and that therefore homestead property remains subject to taxation for that purpose just the same as before the adoption of the amendment. They also agree with the writer in holding that the same protection in the way of taxing power would extend to refunding bonds which are exchanged for a like amount of the original bonds which are being refunded; but they go a step further than the writer, and hold, as did the court below in this case, that the same protection would also extend to the entire issue of refunding bonds—those *sold* and the proceeds used to retire the old bonds, as well as those *exchanged* for the old bonds. In other words, they adhere to the principles expressed in the opinion of Mr. Chief Justice DAVIS in his opinion in the case of Boatright v. City of Jacksonville, 117 Fla. 477, 158 So. 42. Mr. Justice BUFORD dissents in part, his view being that all bonds issued after the adoption of the Homestead Exemption Amendment, whether refunding or original bonds, fall within the full operative effect of that amendment, and that no taxes can be levied on homesteads as therein defined for the payment of bonds of any character issued after the adoption of said amendment, excepting of course "special

assessments for benefits" which exception is contained in the amendment itself. The court regrets that Mr. Justice ELLIS, who is unavoidably absent on account of illness, cannot participate in the decision of this case.

The result of these views is that the decree of validation appealed from should be, and is hereby,

Affirmed.

WHITFIELD, C. J., and TERRELL, BUFORD and DAVIS, J. J., concur.